THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID KRUGER, Defendant-Appellant.

First District (3rd Division)   No. 1—89—3113

Opinion filed September 30, 1992.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and Kathy Dietz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

In a bench trial, defendant David Kruger was found guilty of the murder of Fernando Delgado and unlawful use of a firearm by a felon and was sentenced to 25 years in prison.

On appeal, defendant alleges (1) the trial court erred in not considering a second pistol shot to be in defense of others; (2) the conviction should have been for voluntary manslaughter rather than murder since defendant (a) acted under the unreasonable belief that deadly force was justified or (b) acted under a sudden and intense passion, having just witnessed the shooting of two friends by the deceased; (3) the trial court's characterization that defendant shot the deceased "in cold blood" was based upon an inaccurate recollection of trial testi-

mony and denied defendant a fair trial; and (4) the trial court erred when it found the State's only occurrence witness credible.

We affirm defendant's conviction. The trial court has made very specific findings and the requisite support for them appears in the record.

The relevant facts are that at 2 a.m. on May 23, 1987, defendant and two friends, "Mo" and "Cheo," were sitting on a front porch drinking beer when the victim, Delgado, approached on the sidewalk. Cheo approached the victim, argued with him in Spanish and then took a swing at the victim but missed. Delgado then said in Spanish, "I'm going to kill you, son of a bitch," and allegedly pulled out a switchblade. When Mo walked toward them, Delgado then withdrew a gun from his person and fired two shots, wounding both Cheo and Mo. Delgado chased Mo and Cheo into a gangway, but another man apparently distracted Delgado, causing Delgado to turn and fire at him, although missing. Mo ran out of the gangway and entered the car of a friend who drove him to the hospital.

The State's only occurrence witness, Edgardo DelValle, testified that he was at the scene and saw Delgado chase Mo and Cheo, and then run out of the gangway. DelValle stated that defendant then ran up without a gun, and kicked Delgado from behind, causing him to fall to the ground. Defendant then hit Delgado on the head to encourage him to drop the gun, which defendant then picked up and used to shoot Delgado in the back.

DelValle further testified that defendant then shook Delgado by his jacket, pulled his head back by the hair and shot him in the head.

Defendant testified that he did not understand Spanish. On direct, he stated that he heard two shots, and after the second shot, he heard Cheo yell "I'm shot." Defendant testified that after the second shot he left the scene and ran down the street to an apartment occupied by the Rivera family. He further testified on direct that he told Carmen Rivera that Cheo and Mo had been shot by a Mexican. On cross-examination, however, defendant stated that he did not stay at the scene long enough to determine if Mo was shot.

Defendant knew Carmen Rivera through Mo and Cheo and had been to her apartment before. Carmen and Evelyn Rivera testified that prior to defendant's arrival, they heard four shots in rapid succession, then heard two shots together a little later. Evelyn testified that defendant arrived about 10 minutes after the shots were heard. Carmen testified that defendant stated that Cheo and Mo had been shot and that he had shot the "neck," a derogatory term for a Mexi-

can. Carmen testified that defendant said he threw the gun in the trash.

Evelyn and Maria, another Rivera sister, went to the hospital to find Mo and Cheo. When they returned to their apartment, Evelyn testified that she saw defendant laughing as he exited the bathroom. However, there was no further testimony by any of the witnesses regarding what defendant might have found amusing.

The trial court found the testimony of DelValle and the Riveras more credible than defendant's and that their testimony proviced evidence beyond a reasonable doubt as to defendant's guilt.

The trial court specifically found from the evidence that defendant had sufficient time to reflect upon his actions during the course of the shooting and between the two shots. The trial judge also determined from the evidence that the situation was not such that a reasonable person would have been so seriously provoked as to shoot the victim a second time or that the second shot was in defense of himself or another.

Defendant argues that since Mo testified that Delgado had a switchblade tucked in the front of his pants, defendant was justified in shooting Delgado in self-defense or in defense of his friends, and that multiple shots do not negate that justification.

■ Although the trial court speculated that the defense of others theory regarding the first shot might be appropriate, the second shot was clearly not self-defense since there was no one in harm's way and no further need to defend anyone.

There was no serious threat by the time of the second shot when the victim lay motionless, facedown on the ground with a bullet in his back, the alleged switchblade underneath him out of reach, and defendant standing over him with a gun in hand. At that time defendant appeared to evidence no fear of serious injury since he had already shaken the victim with his hands and pulled his head back by the hair.

Further, we are not persuaded that the record establishes a defense of justification for the first shot. While Mo stated he saw the victim with a switchblade, at the time defendant fired his first shot, the victim was on his stomach on the ground, lying atop any knife he was alleged to have. Based upon the evidence in the record, we do not agree with defendant that he reasonably believed Delgado posed a serious threat even at the time of the first shot.

When the evidence conflicts, the appellate court should not substitute its judgement for that of the trial court. (*People v. Felella* (1989), 131 Ill. 2d 525, 534, 546 N.E.2d 492; *People v. Sanchez* (1990), 206 Ill.

App. 3d 90, 108, 563 N.E.2d 1127.) It is the trial judge who sees and hears the witnesses testify, weighs their credibility, draws reasonable inferences from the testimony and resolves conflicts in the evidence when determining the reasonableness of the defendant's action in killing the deceased. (*Sanchez*, 206 Ill. App. 3d at 108.) The trial court here specifically interpreted the conflicting evidence to find no legal justification for the second shot.

Defendant next argues that the State failed to disprove beyond a reasonable doubt that defendant held an unreasonable belief that deadly force was justified, and thus has proven only voluntary manslaughter and not murder. See *People v. Reddick* (1988), 123 Ill. 2d 184, 197, 526 N.E.2d 141 (wherein the State is required to prove beyond a reasonable doubt that manslaughter defenses are meritless and prove beyond a reasonable doubt the statutory elements of murder).

Voluntary manslaughter, to which defendant refers, is the intentional or knowing killing of another committed under an unreasonable belief that deadly force is necessary. Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).

Voluntary manslaughter is similar to the defense of others justification in that both involve defendant's subjective belief at the time of the killing that deadly force was justified. (*People v. Young* (1989), 187 Ill. App. 3d 977, 985, 543 N.E.2d 986.) The difference between the two theories lies in the reasonableness of belief: if the trier of fact finds that the defendant did not act in self-defense, but nevertheless finds that the defendant acted under a belief, albeit unreasonable, that force was justified, then the crime will be reduced from murder to voluntary manslaughter. *Young*, 187 Ill. App. 3d at 985; *People v. Eshaya* (1986), 144 Ill. App. 3d 757, 763, 494 N.E.2d 772.

However, a reviewing court will not reduce a conviction for murder to voluntary manslaughter where the trier of fact has reasonably concluded that the defendant had no basis whatsoever for his belief that deadly force was necessary for the protection of life. *Young*, 187 Ill. App. 3d at 986; *Eshaya*, 144 Ill. App. 3d at 763.

In *Eshaya*, the court rejected defendant's argument that his conviction for murder should be reduced to voluntary manslaughter on the ground that he unreasonably believed that deadly force was justified. Defendant there claimed that even though he stood 20 feet away from the victim and his fellow gang members, he was scared because the others were armed with baseball bats, knives and pool cues. The *Eshaya* court refused to reduce the conviction because it found the jury could have reasonably concluded that there was no justification

for defendant's use of deadly force. *Eshaya*, 144 Ill. App. 3d at 763-64.

Similarly in *Young*, the court declined to reduce defendant's murder conviction to voluntary manslaughter. There, the defendant approached the victim, shot him in the face, fired several shots at other people nearby, and then walked over to where the victim was crawling on the ground and shot him again in the head. The court rejected the defendant's contention that he was frightened, and found no basis whatsoever for defendant's alleged belief that deadly force was necessary to protect his life. *Young*, 187 Ill. App. 3d at 986.

■ As stated in our discussion of the defense of others argument, we find the record amply demonstrates evidence supporting as reasonable the trial court's conclusion that defendant had no basis to believe that either shot was necessary for the protection of life.

Defendant next contends that his conduct amounts only to voluntary manslaughter because he was seriously provoked by having witnessed Delgado's shooting of his two friends.

The statute in effect at the time of the incident provides:

"Voluntary manslaughter. (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed[.]
***

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a).

While there is evidence in the record supporting defendant's contention, the trial court was explicit in its findings on the evidence and its thoughtful consideration of all circumstances of the incident.

In its findings, at the hearing for new trial, and at sentencing, the trial court elaborated:

"There's no rhyme, there's no reason why, [after the first shot,] with no one fighting with [defendant,] with no one doing anything to indicate that there's going to be any further struggle by the victim, he shoots him in the [head] with what appears to be cold blood. Doesn't appear to be any excited passions or anything.

* * *

There was no further need whatsoever to defend anybody. He had already caused the man to be down and had shot him once in the back. He's now disabled. And the testimony is clear

that he grabbed his head, pulled it back and then shot once in the head. There was sufficient time in my opinion for any type of adrenaline to drain after you have the man down. I don't believe there was anything other than murder involved."

While the trial court noted that adrenaline may be pumping and passion may be aroused, that passion will not relieve a defendant from liability for murder unless it is engendered by a provocation which the law recognizes as being reasonable and adequate; if the provocation is insufficient, the crime is murder. (*People v. Austin* (1989), 133 Ill. 2d 118, 125, 549 N.E.2d 331; *People v. Williams* (1991), 215 Ill. App. 3d 800, 809, 576 N.E.2d 68.) We agree with the trial court that the interval between the two shots was sufficient to allow any passion to subside and that the second shot constituted murder.

Defendant next asserts that he was denied a fair trial because the record establishes that the trial judge's conclusion that defendant shot the victim "in cold blood" rather than under extreme provocation was based upon an inaccurate recollection of the trial testimony.

Defendant's argument concerns the trial court's statement in its decision that "[defendant] shoots him, goes over to the Rivera house, and then seems to brag about it. Maria says he was laughing during the course of his description."

A review of the record shows that it was Evelyn, and not Maria, who testified that she saw defendant laughing as he exited the bathroom in the Rivera apartment some time after the shooting. There was no testimony by any of the witnesses as to the subject or nature of defendant's laughter, or whether it was connected with any description of the evening's events.

Defendant failed to raise this issue in a written motion for new trial as is required unless there is plain error or an error affecting substantial rights. (*People v. Young* (1989), 128 Ill. 2d 1, 38-39, 538 N.E.2d 9.) We do not believe either of those exceptions applies here, finding it impossible to imagine that this inaccurate recollection would change the outcome of a case which has the luxury of an eyewitness. This issue is waived on appeal.

Finally, defendant argues that the trial court erred (1) when it concluded that DelValle's fear of testifying enhanced the credibility of his statements identifying defendant as the shooter, and (2) when it failed to consider other motives for DelValle to testify against defendant.

DelValle, the State's only occurrence witness, made an initial written statement, testified before a grand jury, and later testified at

trial. DelValle initially refused to testify at trial, then later agreed but repudiated at trial part of his original written statement in which he identified "Polacko" as the person who pushed the victim to the ground.

The trial court recognized that the witness was concerned for the safety of his wife and two children, since he had been shot at twice since the incident, but determined that DelValle ultimately testified "in a manner against his interests" and demonstrated a sincere motivation to tell the truth.

Defendant argues that DelValle's partial repudiation at trial demonstrates that DelValle was afraid of testifying against Polacko and, therefore, was motivated to commit perjury to protect himself and the real shooter. Thus defendant contends that the trial court's statement that the witness' testimony was believable because it was against his interests is "illogical."

Defendant also argues that the witness had a self-serving motive to give the same testimony at trial that he gave to the grand jury because the trial court informed the witness that if he testified at trial that he remembered nothing about the shooting, he could be charged with perjury since he had earlier testified before the grand jury. Defendant contends the trial court disregarded this possible self-protection motive, thus prejudicing defendant.

Assessment of the credibility of witnesses is made by the finder of fact at trial, and a reviewing court will not substitute its judgement unless the testimony is so improbable as to raise a reasonable doubt of guilt. *Williams*, 215 Ill. App. 3d at 809; *People v. Hopkins* (1987), 160 Ill. App. 3d 967, 513 N.E.2d 1011.

■ Here, the witness had given a handwritten statement, had testified before a grand jury, and then testified at trial. His trial testimony was apparently consistent with his grand jury testimony, even though he did repudiate part of his written statement. However, we cannot say that this repudiation casts the testimony as so improbable that it raises a reasonable doubt as to defendant's guilt.

Nor do we give credence to defendant's argument that DelValle's grand jury testimony and his trial testimony corroborate only because he was afraid of perjury charges. First, DelValle was under no such interdiction when he testified before the grand jury, and additionally, the court did not mandate the nature of his testimony except to caution that a lapse of memory would not be well received.

■ In a supplemental brief to this court, defendant also contends that his jury waiver was invalid because it appeared only in the com-

mon law record rather than in the report of proceedings, thus entitling him to a new trial.

While a defendant may waive his right to a jury trial (Ill. Rev. Stat. 1987, ch. 38, par. 103—6), that waiver must be made expressly and understandingly. (*People v. Smith* (1985), 106 Ill. 2d 327, 333-34, 478 N.E.2d 357.) However, there is no precise formula for determining whether a waiver has been expressly and understandingly made; instead, each case must be decided on its facts, and an effective waiver may be made either orally in court or in writing. *People v. Deveaux* (1990), 204 Ill. App. 3d 392, 402, 561 N.E.2d 1259.

The supplemental record filed by the State after we allowed the petition for rehearing provides this transcription:

"THE CLERK: David Kruger.

THE COURT: Is this to be bench or jury?

[Defense Counsel]: Bench.

THE COURT: Mr. Kruger, do you understand what a jury trial is?

The Defendant: Yes.

THE COURT: Do you understand that Mr. Slaughter has said that you are asking for a bench trial. A bench trial is a trial where I would listen to all the facts and would make the decision as to whether you are guilty or innocent.

A jury trial, of course, is where twelve people would be selected by your attorney and the state's attorney, and they would listen to the facts. I would tell them what the law is and they would determine whether you are guilty or innocent.

By asking for a bench trial you are giving up your constitutional right to have a jury trial.

Is that what you want to do, sir?

The Defendant: Yes.

THE COURT: Okay. Is there a jury waiver form there?

[Defense Counsel]: Sign right here.

Mr. Kardas: We have witnesses upstairs. I will make arrangements to bring them down.

THE COURT: Let the record indicate that in my presence and in open court I have observed Mr. Kruger sign a jury waiver form. It is my opinion that he has knowingly and intelligently waived his right to a trial by jury.

As soon as counsel is ready we will begin the trial."

We find the supplemental record demonstrates that defendant knowingly and understandingly waived his right to a jury trial. The judge explained the difference between a bench trial and a jury trial,

and cautioned that asking for a bench trial forfeits defendant's right to a jury trial. Defendant responded that he understood the trial court's explanations and chose to waive his right to a jury trial. In fact, a knowing, open-court, on-the-record waiver has been found in language less explicit than the discussion at issue. See *People v. Bowman* (1992), 227 Ill. App. 3d 607, 592 N.E.2d 240.

For all of the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

RIZZI and CERDA, JJ., concur.